George H. Huntington and Elizabeth D. Huntington v. Commissioner.
George H. Huntington v. Commissioner
Docket No. 39074.
United States Tax Court
1953 Tax Ct. Memo LEXIS 147; 12 T.C.M. (CCH) 918; T.C.M. (RIA) 53277; August 14, 1953
*147 The exchange of shares of stock in a corporation that was essentially a holding company for shares in a new company that was essentially an operating company was a transfer that gave rise to gain or loss under the Revenue Act of 1917. John T. Sapienza, Esq., for the petitioners. Paul M. Stewart, Esq., for the respondent. ARUNDELL
Memorandum Findings of Fact and Opinion Respondent determined a deficiency of $10,435.30 in the income tax of petitioners for the year 1948, as a result of his finding that an improper basis was used in computing gain or loss on the sale of certain securities in 1948 by petitioner Elizabeth D. Huntington, hereinafter referred to as petitioner. Prior to 1917 petitioner owned 500 shares of the common stock of Phelps, Dodge & Co. which were exchanged in 1917 for an equal number of shares of stock in Phelps Dodge Corporation. In 1929 the stock was split four for one and petitioner sold her 2,000 shares in 1948. The only issue to be decided is whether the exchange of stock in 1917 was taxable or non-taxable. The parties have stipulated the applicable basis for gain or loss in either event. The facts were fully stipulated and we *148 incorporate them herein by reference. Certain of the pertinent facts are summarized below. Findings of Fact Petitioners, husband and wife, filed a joint income tax return for the year 1948 with the collector of internal revenue for the second district of New York. Petitioner had acquired, between 1909 and 1915, 500 shares of the capital stock of Phelps, Dodge & Co., a corporation organized under the laws of New York, on December 11, 1908. That company was at all times engaged primarily in holding the stock of other companies and owned all the capital stock of the following corporations: Copper Queen Consolidated Mining Company Detroit Copper Mining Company of Arizona
Burro Mountain Copper Company Stag Canon Fuel Company Moctezuma Copper Company Bunker Hill Mines Company Phelps Dodge Mercantile Company Phelps, Dodge & Co. did not directly hold any mining properties or carry on any mining activities, nor did it own stock in any companies other than those listed above. Its only activity other than as a holding company was the selling of metals. In 1916 its income from the sale of metals amounted to $649,453.73, while its income from dividends on the stock of its subsidiaries *149 was $19,100,000. The Copper Queen Consolidated Mining Company, incorporated under the laws of New York on August 10, 1885, was the largest subsidiary of Phelps, Dodge & Co. It was primarily engaged in carrying on the business of mining. Its gross income for 1916 was from the following sources: Sales (Mining)
$29,457,129.69
Interest
794.65
Dividends from Subsidiaries
0
Dividends from Others
249,027.20
Pursuant to certain resolutions passed by the board of directors of Phelps, Dodge & Co. on March 8 and 26, 1917, and by the board of directors of the Copper Queen Consolidated Mining Company on March 12, 1917, the following actions were taken: 1. The Copper Queen Consolidated Mining Company changed its name to Phelps Dodge Corporation, effective March 14, 1917, and increased its authorized capital stock from $2,000,000 to $50,000,000, consisting of 500,000 shares of $100 par value stock. This was identical to the capital structure of Phelps, Dodge & Co. 2. Phelps, Dodge & Co., on March 20, 1917, transferred to Phelps Dodge Corporation all of the capital stock of the following corporations: Detroit Copper Mining Company of Arizona
Burro Mountain Copper *150 Company Stag Canon Fuel Company Moctezuma Copper Company Bunker Hill Mines Company Phelps Dodge Mercantile Company In return for the transfer of the stock of those six companies, Phelps, Dodge & Co. received certificates of indebtedness of Phelps Dodge Corporation in the amount of $73,000,000. 3. On March 31, 1917, Phelps Dodge Corporation acquired from Phelps, Dodge & Co. all of its remaining assets (with the exception of the 20,000 shares of Phelps Dodge Corporation then owned by Phelps, Dodge & Co.) giving in return therefor additional certificates of indebtedness amounting to $1,450,000. 4. On March 31, 1917, Phelps, Dodge & Co. accepted 430,000 shares of stock of Phelps Dodge Corporation in full payment and cancellation of the certificates of indebtedness amounting to $74,450,000. 5. On or about May 15, 1917, Phelps, Dodge & Co. distributed to its stockholders the 450,000 shares of stock of Phelps Dodge Corporation, receiving in exchange all of its own stock. Petitioner exchanged her 500 shares of Phelps, Dodge & Co. stock for 500 shares of Phelps Dodge Corporation. 6. Immediately thereafter Phelps, Dodge & Co. was dissolved. 7. Phelps Dodge Corporation dissolved *151 the Detroit Copper Mining Company of Arizona, the Burro Mountain Copper Company, and the Stag Canon Fuel Company and thereafter continued to own and operate the mining properties of those companies as branches of its own mining operations. It did not dissolve the Moctezuma Copper Company which operated in Mexico, nor the Bunker Hill Mines Company and the Phelps Dodge Mercantile Company. On March 31, 1917, the officers and directors of Phelps, Dodge & Co. and Phelps Dodge Corporation were identical with one minor exception. The certificates of incorporation of both companies conferred general powers to operate either as mining or holding companies. Differences in the corporate powers conferred by the certificates were concerned with activities other than mining or holding stock. In the resolution of the board of directors of Phelps, Dodge & Co. passed March 8, 1917, and proposing the exchange of stock described above, the following language was used: "WHEREAS the operation and conduct of the business of said properties (the various subsidiaries) with separate corporate organizations is complicated, increases expenses and causes confusion; and * * *. "WHEREAS in order to change *152 the form of corporate organization from the holding company plan to the owning and operating plan so far as lawful and consistent, and to secure a more efficient, simple and economical conduct of the business of said companies, it is proposed that the following action be taken: -" * * *
After the conclusion of the 1917 transactions, Phelps Dodge Corporation was still primarily engaged in carrying on the mining business, and in fact did so to an even greater extent as a result of the acquisition of the mining properties formerly owned by the Detroit Copper Mining Company of Arizona, the Burro Mountain Copper Company, and the Stag Canon Fuel Company. For the year 1918 the gross income of Phelps Dodge Corporation consisted of the following: Sales (Mining)
$38,731,569.58
Interest
503,527.58
Dividends from Subsidiaries
2,470,000.00
Dividends from Others
454,951.18
Commissions on Sales
343,098.35
On February 25, 1929, Phelps Dodge Corporation made a four for one split-up of its stock, changing the par value from $100 to $25 per share, and petitioner thereafter held 2,000 shares instead of 500 shares. Petitioner sold the 2,000 shares in 1948 for a net price *153 of $114,065.29. The interest of petitioner in Phelps Dodge Corporation was substantially different from her interest in Phelps, Dodge & Co. The 1917 exchange was a taxable transaction. The adjusted basis for the purposes of sale of the 2,000 shares of Phelps Dodge Corporation by petitioner in 1948 is $112,914.62. Opinion ARUNDELL, Judge: After the passage of appropriate corporate resolutions, Phelps, Dodge & Co. in 1917 entered into a series of transactions with its principal subsidiary, re-named Phelps Dodge Corporation, whereby Phelps, Dodge & Co. was dissolved after its stockholders had exchanged their stock for an equal number of shares in Phelps Dodge Corporation. It is petitioner's contention that although the exchange in 1917 was then treated as nontaxable by all interested parties in good faith, subsequent decisions indicate that the exchange was taxable. It was on that theory that petitioner, in preparing her income tax return for 1948, considered the fair market value at the time of the 1917 exchange the appropriate basis for computing gain or loss on the sale of her 2,000 shares of stock in Phelps Dodge Corporation. It is respondent's contention that the exchange *154 in 1917 was nontaxable and that petitioner's basis for the stock in the predecessor corporation, Phelps, Dodge & Co., is applicable. The Revenue Act in effect at the time of the exchange contains no provision covering corporate reorganizations and related transactions. Our decision, then, will turn upon the application of the case law which has developed. Petitioner relies primarily on , certiorari denied , and . In the Bancker case, the taxpayer exchanged, with another individual, stock of the Coca-Cola Company, an operating company, for stock of the Coca-Cola International Corporation which had no substantial assets other than a majority of the outstanding stock of the Coca-Cola Company. Coca-Cola International Corporation was then engaged in reducing its capital stock by offering two shares of Coca-Cola Company for each share of its own stock. The two for one exchange was in accord with fair market value. In holding the exchange taxable, the Court said: "Notwithstanding the close relationship maintained in 1930 between the shares involved in Bancker's exchange, *155 they were essentially different. The corporations, though organized under the same law, probably had different corporate powers and certainly were engaged in wholly different activities. A share of Coca-Cola stock entitled its owner to vote in the meetings of that company, to draw dividends directly from it, and to share in its assets on dissolution. A share of International could at the holder's option be used to make him the holder of two shares of Coca-Cola, but until he exercised the option he was entitled only to vote in the meetings of International, to receive such dividends as it declared, and on dissolution to share in its then assets. * * * It was a true conversion of his capital into a substantially different investment, and served to realize and to measure the gain he had from his original purchase of Coca-Cola stock." Cf. Respondent attempts to distinguish the Bancker and Cullinan cases from the question before us by pointing out that in both of those cases the taxpayer was parting with stock in an operating company and receiving stock in a holding company, whereas the reverse is true in the case at bar. That attempted distinction *156 has no validity in the light of the Court's language in $2 . There the taxpayers exercised the option of exchanging stock of Coca-Cola International Corporation for stock of Coca-Cola Company. In ruling on an issue not germane to the question here, the Court said: "If the Prescotts' transaction be looked on as an exchange of stocks, the case is ruled by Bancker's Case. It is not true that the Prescotts in receiving the shares of Coca-Cola merely got what they already equitably owned as stockholders. The assets of a corporation are not the property of the stockholders, either in law or in equity, but belong to the corporation, and are subject to its disposal and to its debts. * * *" We think that in the case at bar petitioner's interest after the exchange was essentially different from her previous interest and, therefore, the transaction was one that gave rise to gain or loss. Respondent concedes in his brief that Phelps, Dodge & Co. was a holding company to the extent of about 90 per cent and that Phelps Dodge Corporation was an operating company to the same extent. Prior to the exchange, petitioner had no direct rights with *157 respect to the mining properties. Her only interest was in the holding company. One of the principal purposes of the reorganization as set forth in the corporate resolution was a change from the holding company plan to the owning and operating plan. Respondent cites , and , in support of his contention that petitioner's interest was not essentially changed by the exchange and that it should be regarded as nontaxable. In neither of those cases was there a question of a change from a holding company to an operating company or vice versa. We think that respondent was in error in not permitting the use of the adjusted fair market value of the securities at the time of the exchange as petitioner's basis. Decision will be entered under Rule 50.